SIXTH DIVISION
October 22, 2010

No. 1-09-1130

| | |
|---|---|
| FOUNDERS INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff-Appellee, | ) Appeal from |
| | ) the Circuit Court |
| v. | ) of Cook County |
| | ) |
| SIRAJ A. SHAIKH, | ) 07 CH 13583 |
| | ) |
| Defendant | ) Honorable |
| | ) James R. Epstein, |
| (MUHAMMAD M. KHAN, | ) Judge Presiding. |
| | ) |
| Defendant-Appellant) | ) |

JUSTICE McBRIDE delivered the opinion of the court:

The circuit court granted summary judgment to Founders Insurance Company on its claim that its insured driver Siraj A. Shaikh, who was involved in a two-car collision, breached the assistance and cooperation clause of his automobile policy. The court's finding relieved the insurer of any duty to defend or indemnify Shaikh from litigation and an $11,000 judgment entered for the other driver, Muhammad M. Khan. Because Shaikh's whereabouts are unknown, Khan cannot collect the judgment. Khan argues for reversal on grounds that the insurer had control of negotiations with Khan but delayed settling the case in breach of its duty of good faith toward its insured and failed to show the substantial prejudice necessary to justify invocation of the contract clause.

Summary judgment can aid in the expeditious disposition of a lawsuit, but it is considered a drastic remedy which should be granted only when the pleadings, depositions, affidavits, admissions, and exhibits on file show that there is no genuine issue of material fact and that the

moving party is entitled to judgment as a matter of law. *Kleinwort Benson North America, Inc. v. Quantum Financial Services, Inc.*, 285 Ill. App. 3d 201, 208-09, 673 N.E.2d 369, 374-75 (1996). The court should construe all of the foregoing documents strictly against the moving party and in favor of the responding party, and where reasonable persons could draw different conclusions, deny summary judgment. *Kleinwort Benson*, 285 Ill. App. 3d at 209, 673 N.E.2d at 375. A circuit court's entry of summary judgment is addressed *de novo* on appeal. *Kleinwort Benson*, 285 Ill. App. 3d at 209, 673 N.E.2d at 375. Under this standard, the facts and law are considered anew, without any deference to the judgment of the court. *Kleinwort Benson*, 285 Ill. App. 3d at 209, 673 N.E.2d at 375.

Shaikh, who was born in 1949, applied for insurance coverage from Founders Insurance Company (Founders) on or about March 12, 2003. The home address he provided was 489 James Court, #C, Glendale Heights, Illinois, 60139. The following day, Founders issued a one-year policy. About a month later, Shaikh was driving the insured vehicle on Chicago's northwest side at 1:05 a.m. on Monday, April 14, 2003, when the collision at issue occurred in the inter-section of Talman and Devon Avenues. The police report indicates Shaikh was ticketed for failure to stop and both vehicles were towed from the scene. Defendant Khan, who was born in 1975, complained of knee, neck, and back pain, and was transported to a hospital. Shaikh told the investigating officer his address was 6150 North Lincoln Avenue, Chicago, Illinois. On June 5, 2003, Khan's attorney told Founders his claims would include bodily injury and lost wages. On December 2, 2003, Khan's insurer accepted $5,757 to settle his property damage claim. On January 30, 2004, counsel told Founders that Khan's losses included $6,590 for medical care and

$651 for lost wages, and on February 28, 2005, counsel demanded the limits of Shaikh's coverage, which was $20,000. However, on March 9, 2005, Founders countered with a settlement offer of $2,000 and indicated it would not raise this amount despite Khan's threat to file suit.

About three years after the collision, Shaikh telephoned Founders on May 12, 2006, and notified senior claim analyst Cort Fornero that he had been served with the summons and complaint for Khan v. Shaikh, 05-M1-301121. According to an affidavit prepared by Founders' employee Erin Goggin, a senior claim analyst, the documents and notes in Founders' underwriting, claim, and litigation files indicated Fornero then asked Shaikh to fax a copy of the litigation documents, and informed Shaikh that a lawyer would file an appearance on his behalf and Shaikh did not need to appear in court on the return date specified in the summons. During that telephone conversation, Shaikh told Fornero his current address was 1721 North Mannheim Road, Unit 16, Stone Park, Illinois, and he provided his current home telephone number. That same day, Shaikh faxed a copy of the Khan lawsuit to Founders and indicated on the fax cover page that his address was "1721 N. Mannheim Rd, #16, Stone Park, IL 60165." Later that day, Fornero transmitted Shaikh's cover page to Engelberg & Hillison, the Chicago law firm Founders hired to provide Shaikh's legal defense. On May 17, 2006, which was the return date on the summons, Shaikh telephoned Fornero and was again advised that a lawyer would file an appearance and answer on his behalf and also told that the lawyer would contact Shaikh during the discovery phase of the case to obtain answers to written or oral questions about the collision.

Later that same year, on December 21, 2006, attorney Allen Engelberg told Fornero that

correspondence sent to Shakih had been returned to the law firm as undeliverable. Fornero dialed Shaikh's telephone number and learned the service was disconnected.

Fornero turned the matter over to Founders' special investigation unit, where Carolyn Berna generated a database search on LexisNexis which showed Shaikh's two most recent addresses were the ones on Lincoln Avenue and Mannheim Road. On January 4, 2007, Berna went to the Mannheim Road property in person. A man occupying the apartment unit told Berna that he had recently moved in, that Shaikh did not reside there, and that he did not know Shaikh or have any information about him. On January 8, 2007, Berna went to the Lincoln Avenue address, which turned out to be a commercial property occupied by a law firm, and a woman in the office said she did not know Shaikh or know why he would use the address as his own. On January 18, 2007, Founders retained the professional investigation firm of Stern Process & Investigation L.L.C. (Stern Process) to locate Shaikh and hand deliver a letter to him about the Khan lawsuit. Research conducted by Stern Process indicated that a different Mannheim Road address was Shaikh's most recent. Instead of 1721 Mannheim Road, the most current address was 1837 Mannheim Road. On January 20, 2007, Stern Process investigator George F. Kelleher went to the new Mannheim address and discovered it was an automobile muffler shop. The shop's manager did not know Shaikh and the current owners of the business had owned it for six years and were unacquainted with Shaikh. Next, Stern Process investigator Todd Martinson located Shaikh's son, Kaiser Shaikh, who was living at 46 Stonefield Drive, Glendale Heights, Illinois, but when Martinson telephoned Kaiser on January 25, 2007, Kaiser said he had not been in contact with his father in "years."

Meanwhile, the Khan lawsuit was progressing. On February 5, 2007, the circuit court entered a written order indicating Shaikh must answer written discovery by February 26, 2007, or be barred from testifying or presenting any evidence at trial or mandatory arbitration proceedings.

On February 16, 2007, investigator Martinson went to the James Court address stated in Shaikh's application for insurance and confirmed that Shaikh was no longer residing there. On March 28, 2007, claim analyst Goggin sent letters to Shaikh at the James Court address (the application address), the Lincoln Avenue address (the commercial property occupied by a law firm), and the first of the two Mannheim Road addresses (the residential unit with a new occupant who denied knowing Shaikh). All three letters were returned as undeliverable, but the postal service indicated on the envelope returned from James Court that Shaikh's expired forwarding address was the Stonefield Drive property where his son Kaiser was residing. Claims analyst Goggin pursued this lead on April 3, 2007, by sending a letter to Shaikh by regular and certified mail delivery to the Stonefield Drive address and on April 4, 2007, by having investigator Berna go to the Stonefield Drive property herself, and after receiving no answer, leave a copy of the letter on the residence door. The copy sent by certified mail was returned as "Unclaimed." The correspondence announced Founders' intention to file a declaratory judgment action regarding the assistance and cooperation clause of the insurance contract. That clause states:

"**CONDITIONS**

\* \* \*

5. **Assistance and Cooperation of the Insured - Parts I [Liability], III [Physical Damage] and IV [Uninsured Motorist**

**Coverage].** As a condition precedent to the Company's duty of indemnity with respect to suits against an insured, the insured shall cooperate with the Company and, upon the Company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured ***; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. *** The insured must cooperate with us in the investigation, settlement or defense of any claim or suit, failure to cooperate fully will be deemed a breach of contract." (Emphasis in original.)

On April 13, 2007, Founders' claim analyst Rick Seroka telephoned Kaiser, who told him that Shaikh left the family 15 years earlier and might be in jail. That same day, claims analyst Goggin contacted the Illinois Department of Corrections and learned that Shaikh was not an inmate. On April 16, 2007, investigator Berna conducted a LexisNexis inmate search and contacted the Cook County Department of Corrections and the Illinois Department of Corrections, but all three sources indicated Shaikh was not incarcerated.

On May 13, 2007, a mandatory arbitration hearing was convened in the Khan action. Shaikh did not appear and an award was entered against him in Khan's favor in the amount of $11,000 and costs of the suit, which were about $500.

On May 21, 2007, Founders filed the instant declaratory judgment action and sought

service of process at the Stonefield Drive address. A deputy sheriff returned the summons, indicating "Ms. Khadisa advised [on June 4, 2007,] she divorced defendant 16 years ago and doesn't know where he is."

On September 11, 2007, due to Shaikh's failure to appear at the arbitration hearing, the circuit court barred him from rejecting the arbitration award and entered judgment on the award.

Stern Process investigator Eric L. Bey made one last attempt to contact Shaikh. As of November 26, 2007, Shaikh's Illinois driver's license was still registered at the 1721 N. Mannheim Road address, with an expiration date of July 28, 2008, and this was the last street address Shaikh provided to Founders. On November 28, 2007, Bey went to the apartment building at that address, confirmed that Shaikh's name was not on any mailbox or doorbell, and spoke with the tenants in units 9, 16, and 19, who all indicated they did not know Shaikh.

On February 29, 2008, the circuit court granted Founders leave pursuant to section 2-203.1 of the Code of Civil Procedure to serve Shaikh through the Secretary of State and by publication. See 735 ILCS 5/2-203.1 (West 2006) (indicating where affidavit demonstrates personal service is impracticable despite diligent inquiry and reasonable efforts, the court may authorize alternate means of service consistent with due process).

On May 8, 2008, the court entered a default against Shaikh for failing to file an appearance in the declaratory judgment action "despite being duly served." Founders and Khan subsequently filed cross-motions for summary judgment regarding the assistance and cooperation clause. After the motions were fully briefed, the court took that matter under advisement and then resolved the crossmotions in Founders' favor.

Khan's first appellate argument is that an insurer owes a duty of good faith to its insured to settle a case so that the insured is not in jeopardy of a legal judgment and that although Founders promptly settled Khan's property damage claim it "made no reasonable effort" to resolve his remaining claims for bodily injury and lost wages. Khan contends the circumstances warrant reversal of the summary judgment ruling. Founders responds that the good-faith settlement principle is irrelevant here.

In our opinion, Khan has misstated the good-faith duty discussed in *Cramer v. Insurance Exchange Agency*, 174 Ill. 2d 513, 675 N.E.2d 897 (1996) and *Haddick v. Valor Insurance Co.*, 315 Ill. App. 3d 752, 735 N.E.2d 132 (2000). According to this authority:

> "[Duty to settle] cases generally involve a policyholder, a liability insurer, and a third party. The liability insurer has assumed the policyholder's defense under the policy and is negotiating a settlement with a third party. In the typical 'duty to settle' case, the third party has sued the policyholder for an amount in excess of the policy limits but has offered to settle the claim against the policyholder for an amount equal to or less than those policy limits.
>
> In this circumstance, the insurer may have an incentive to decline the settlement offer and proceed to trial. The insurer may believe it can win a verdict it its favor. In contrast, the policyholder may prefer to settle within the policy limits and avoid the risk of trial. The insurer may [wish to] ignore the policyholder's interest

> and decline to settle. [However,] *** the insurer has a duty to act
> in good faith in responding to settlement offers. [Citation.] When
> an insurer breaches this duty by refusing to settle, the insurer may
> be liable for the full amount of a judgment against a policyholder,
> regardless of policy limits." *Cramer*, 174 Ill. 2d at 525-26, 675
> N.E.2d at 903.

See also *Haddick*, 315 Ill. App. 3d at 755, 735 N.E.2d at 134 (an insurer's duty to act in good faith in responding to settlement offers "is implied in law to protect the policyholder from exposure to liability in excess of coverage as a result of the insurer's gamble on which only the policyholder may lose"). Thus, when "the recovery sought in an action may not exceed the policy limits, the insurer need not consider the interests of the insured in conducting the defense." *Cernocky v. Indemnity Insurance Co.*, 69 Ill. App. 2d 196, 206, 216 N.E.2d 198, 204 (1966). However, when negotiating settlements in which recovery potentially will exceed the policy limits, the insurer must give the interest of the policyholder consideration at least equal to its own. *Cernocky*, 69 Ill. App. 2d at 206, 216 N.E.2d at 204. A cause of action against an insurer arises if the insurer's refusal to settle a claim within the policy limits amounts to negligence or bad faith. *Cernocky,* 69 Ill. App. 2d 196, 216 N.E.2d 198. Thus, what Khan describes as a duty to settle is actually a duty to settle a claim where there could be liability in excess of the policy limits, and we fail to see the relevance of this principle here. Even by Khan's own account, his medical and wage claims were only about half the policy limits and he opened settlement negotiations with a demand for the policy limits, not more. The record shows he made 10 other personal injury

9

claims to insurance companies between 2000 and 2004 and that the insurer referred his claim to its special investigations unit before countering the demand with a much lower offer. Khan was subsequently awarded only about half the policy limits by the arbitrator and the circuit court. Thus, the facts do not suggest the insurer was ever under a duty to compromise with Khan due to the likelihood of a judgment in excess of Shaikh's policy limits. More importantly, none of the authority suggests a third party's injury claim precludes an insurer from enforcing a contractual right to have the policyholder's assistance and cooperation in resolving a claim. If this were the rule, any time a third party made an injury claim, the insurer would be liable regardless of the policyholder's conduct and there would be no need for declaratory judgment actions such as this one. Accordingly, Khan's first argument on appeal does not persuade us to reverse the circuit court's summary judgment ruling.

Next, Khan argues Founders failed to show that Shaikh's breach of the assistance and cooperation clause was wilful and substantially prejudiced the insurer in defending the tort action. The insurer responds that the record demonstrates it acted with reasonable diligence and in good faith to secure Shaikh's participation and there can be no legitimate dispute that its defense was hampered by the absence of the only witness to the collision besides Khan.

An assistance and cooperation clause enables an insurer to prepare its defense to a loss claim and prevents collusion between the insured and injured party. *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178, 191, 579 N.E.2d 322, 327 (1991). Typically an insurer has little to no knowledge of the relevant facts, and is therefore dependent upon its insured for fair and complete disclosure. *Waste Management*, 144 Ill. 2d at 204, 579

N.E.2d at 333. While an insured has no duty to assist an insurer in any effort to defeat a proper claim for recovery, the insured must disclose all facts within his knowledge and otherwise help the insurer determine coverage under the policy. *Waste Management*, 144 Ill. 2d at 204, 579 N.E.2d at 333. In order to establish breach of a cooperation clause, the insurer must show that it exercised a reasonable degree of diligence in seeking the insured's participation and that the insured's absence was due to a refusal to cooperate. *Mazzuca v. Eatmon*, 45 Ill. App. 3d 929, 932, 360 N.E.2d 454, 456 (1977). Whether the insurer exercised a reasonable degree of diligence and the insured's failure to appear could reasonably be attributed to a refusal to cooperate are questions that are resolved by examining the facts of the particular case. *Mazzuca*, 45 Ill. App. 3d at 932, 360 N.E.2d at 456. In *Pennsylvania Threshermen & Farmer's Mutual Casualty Insurance Co. v. Owens*, 238 F.2d 549, 550 (4th Cir. 1956), the court reasoned:

"The problem of non-cooperation has a dual aspect: not only what the assured failed to do, but what the insurer on its part did to secure co-operation from an apathetic, inattentive, or vanished policy holder, must be considered. Liability insurance is intended not only to indemnify the assured, but also to protect members of the public who may be injured through negligence. Indeed, such insurance is made mandatory in many states. It would greatly weaken the practical usefulness of policies designed to afford public protection, if it were enough to show mere disappearance of the assured without full proof of proper efforts by

11

the insurer to locate him."

Accord *M.F.A. Mutual Insurance Co. v. Cheek*, 66 Ill. 2d 492, 500-01, 363 N.E.2d 809, 813 (1977) (automobile insurance policies are private agreements between insurer and its client, but the public as whole benefits from their existence). Therefore, as a matter of public policy, an insurer will not be relieved of its contractual responsibilities unless it proves it was substantially prejudiced by the insured's actions or conduct in regard to its investigation or presentation or defense of the case. *M.F.A. Mutual*, 66 Ill. 2d at 500, 363 N.E.2d at 813. " 'Such relief, absent a showing of [substantial] prejudice, would be tantamount to a questionable windfall for the insurer at the expense of the public.' " *M.F.A. Mutual*, 66 Ill. 2d at 500, 363 N.E.2d at 813, quoting *Oregon Automobile Insurance Co. v. Salzberg*, 85 Wash. 2d 372, 377, 5235 P.2d 816, 819 (1975).

For instance, in *Johnson,* the insurer's only attempt to secure its client's appearance at trial was mailing a letter to her one month before the court date. *Johnson v. Wade*, 47 Ill. App. 3d 610, 612, 365 N.E.2d 11, 12 (1977). The letter directed her to immediately telephone her insurer to confirm receipt of the correspondence, which she did not do, and she did not show up at the court house in Chicago. *Johnson*, 47 Ill. App. 3d at 612, 365 N.E.2d at 12. The attorney also failed to appear, and although he subsequently claimed to have called the insured on the eve of trial, the judge was apparently skeptical of this, as counsel also admitted his office did not have a docket system to remind him to contact clients when trial dates were approaching, and attorneys were responsible for handling these tasks on their own. *Johnson*, 47 Ill. App. 3d at 612, 365 N.E.2d at 12. Regardless, the court characterized the client's nonresponsiveness to the letter as

"constructive notice that a problem existed," which should have prompted counsel to investigate the client's availability prior to the eve of trial. *Johnson*, 47 Ill. App. 3d at 615, 365 N.E.2d at 14. Then, if the client was hesitant or unavailable, counsel would still have time to coax her with a disclaimer letter or subpoena, or to motion the court to reschedule the trial. *Johnson*, 47 Ill. App. 3d at 615, 365 N.E.2d at 14. The insurer argued its client had been cooperative in the past, that her failure to respond was "unprecedented," and that the insurer made every reasonable effort to garner her court appearance. *Johnson*, 47 Ill. App. 3d at 614, 365 N.E.2d at 13. The insurer also argued its client no longer had a financial interest in the case once she settled her counterclaim. *Johnson*, 47 Ill. App. 3d at 614, 365 N.E.2d at 13. But because the insurer could not show its client's failure to appear was actually a refusal to cooperate, the insurer could not rely on the cooperation clause in its insurance policy, and became liable for the judgment entered against her. *Johnson*, 47 Ill. App. 3d at 615, 365 N.E.2d at 14.

Similarly, in *Lappo*, the insurer sent numerous letters and mailgrams to its client informing her of various deposition and court dates, but when she did not respond, the insurer made no attempt to contact her in person. *Lappo v. Thompson*, 87 Ill. App. 3d 253, 255, 409 N.E.2d 26, 28 (1980). As in *Johnson*, the court concluded the failure to respond to correspondence within a reasonable time was constructive notice that a problem existed. *Johnson*, 47 Ill. App. 3d at 615, 365 N.E.2d at 14; *Lappo*, 87 Ill. App. 3d at 255, 409 N.E.2d at 28. Misspelling her own name when signing a receipt for a certified letter suggested she might not be fully literate, which would explain her failure to respond to the letters. *Lappo*, 87 Ill. App. 3d at 255, 409 N.E.2d at 28. Nevertheless, the insurer did not take further action. *Lappo*, 87 Ill. App. 3d 253, 409 N.E.2d 26.

Accordingly, the court rejected the conclusion that the insurer exercised a reasonable degree of diligence and that the insured's failure to appear was actually a refusal to cooperate. *Lappo*, 87 Ill. App. 3d at 255, 409 N.E.2d at 28.

*Gallaway* illustrates when the contrary conclusions are warranted. *Gallaway v. Schied*, 73 Ill. App. 2d 116, 219 N.E.2d 718 (1966). In that case the insured reported an automobile accident to her insurance company within a few days of the incident in Chicago on December 12, 1959, forwarded a written report within two weeks, and promptly forwarded a summons. *Gallaway*, 73 Ill. App. 2d at 119, 219 N.E.2d at 719. She also apparently received some letters sent to the address listed in her policy and on the accident report. *Gallaway*, 73 Ill. App. 2d at 125, 219 N.E.2d at 722. After initially helping the insurer, however, the client missed two deposition dates during the summer of 1960, and the insurer learned upon telephoning her employer and her mother that she had moved away two weeks earlier. *Gallaway*, 73 Ill. App. 2d at 120, 219 N.E.2d at 720. Two letters and a telegram sent to her in September were returned unclaimed. *Gallaway*, 73 Ill. App. 2d at 121, 219 N.E.2d at 720. A private investigator hired in late October could not find her and reported that she could possibly be in San Francisco or Los Angeles. *Gallaway*, 73 Ill. App. 2d at 121, 219 N.E.2d at 721. These facts indicated that despite the insurer's good faith and reasonably diligent efforts to ascertain her whereabouts and secure her participation in the defense, the client had wilfully chosen not to respond and cooperate after initially communicating with the insurer about the accident. *Gallaway*, 73 Ill. App. 2d at 125, 219 N.E.2d at 722-23.

The two-car collision discussed in *Mazzuca* involved a vehicle that was on short-term

14

rental from O'Hare International Airport in 1968. *Mazzuca*, 45 Ill. App. 3d at 930-31, 360 N.E.2d at 454-55. The car rental company and its insurer had no record of an accident when they received a letter in 1969 from an attorney about a pending tort suit. *Mazzuca*, 45 Ill. App. 3d at 930, 360 N.E.2d at 455. It was unclear whether the rental company had a good system for documenting accidents. *Mazzuca*, 45 Ill. App. 3d at 933, 360 N.E.2d at 457. In an apparent half-hearted effort to track down the man who rented the car, the insurer's investigator went to the address on the rental contract, and then purportedly pursued a forwarding address from the post office, but could only say the post office " 'didn't seem to give us the information we needed.' " *Mazzuca*, 45 Ill. App. 3d at 930, 360 N.E.2d at 455. The investigator also went to the address on the man's *pro se* appearance form, which was his place of employment, but when the investigator learned the man was not there and worked irregular hours, he did not return until the man was no longer employed there. *Mazzuca*, 45 Ill. App. 3d at 930-31, 360 N.E.2d at 455. The investigator was given another address and telephone number, which he called without reaching the man, and then never visited the address. *Mazzuca*, 45 Ill. App. 3d at 930-31, 360 N.E.2d at 455. He was also given a post office box number, but never sent a letter there, and received a third address which he also failed to look into. *Mazzuca*, 45 Ill. App. 3d at 931, 360 N.E.2d at 455. The investigator also neglected to pursue a credit report, driver's license records, or Social Security data, and did not advertise in the newspaper. *Mazzuca*, 45 Ill. App. 3d at 931, 360 N.E.2d at 456. His investigative efforts consisted of a little more than five hours spread out over three months. *Mazzuca*, 45 Ill. App. 3d at 934, 360 N.E.2d at 457. In 1970, the insurer mistranscribed the man's address from the car rental contract, and when correspondence sent there was returned

15

indicating there was no such number, the insurer did not correct its error and resend the letter. *Mazzuca*, 45 Ill. App. 3d at 932, 360 N.E.2d at 456. Instead, the insurer sent a letter to what it already knew was the man's former place of employment, and this letter was, predictably, returned. *Mazzuca*, 45 Ill. App. 3d at 932, 360 N.E.2d at 456. The insurer did nothing for two years, and then hired a new investigator who attempted to find the man at the address on the rental contract, which the insurer already knew was a dead end. *Mazzuca*, 45 Ill. App. 3d at 932, 360 N.E.2d at 456. Thus, despite the fact that letters had been sent, a telephone call was made, and two investigators had been hired, the court could not find any indication that the driver had affirmatively and wilfully refused to cooperate with the insurer. *Mazzuca*, 45 Ill. App. 3d at 934, 360 N.E.2d at 458. The court pointed out that leads had been abandoned and certain sources were never investigated. *Mazzuca*, 45 Ill. App. 3d at 934, 360 N.E.2d at 458. It concluded: "While it cannot be stated with any amount of certainty that such efforts would have yielded more positive results, their absence indicates that the investigation which did take place was little more than a cursory, *pro forma* procedure. Such efforts [are not the] *** reasonable degree of diligence necessary to invoke the affirmative defense of noncooperation." *Mazzuca*, 45 Ill. App. 3d at 934, 360 N.E.2d at 458.

The record on appeal shows Founders used reasonable efforts and diligently pursued contact with Shaikh in order to secure his cooperation with its investigation and defense of Khan's suit. Founders used sources that were likely to disclose Shaikh's whereabouts, its search was sufficiently broad and successful at producing leads, and it pursued and exhausted every lead it generated. The circumstances are reminiscent of those described in *Gallaway*, where the

16

insured cooperated with the insurer at first, but then dropped out of sight and could not be located. *Gallaway*, 73 Ill. App. 2d 116, 219 N.E.2d 718. The results of Founders' persistent efforts suggest that Shaikh did not want to be found. More specifically, although Shaikh initially communicated with the insurer after the accident in mid 2003, and continued to telephone and fax the insurer as late as May 2006, by December 2006, mail sent to his reported residence was returned as undeliverable and his telephone service was disconnected. Within mere days of being alerted to a potential problem, Founders' investigator was searching databases and visiting his last-reported addresses, and the insurance company kept up an active search. One of those last-reported addresses was the apartment which Shaikh had vacated and the other was commercial space occupied by a law firm with no connection to Shaikh. At that point, Founders took the extra step of retaining an outside investigation firm. Although the investigators turned up a new address and Shaikh's son, the new address turned out to be commercial property occupied by a muffler shop and the long-term business owners did not know Shaikh or have any idea why he would claim their address, and the son said it had been "years" since he communicated with Shaikh and that Shaikh might be in jail. Even so, Founders' employees and outside investigators continued to send mail, attempt to hand deliver correspondence, track down a forwarding address, question the current occupant and neighbors of the last-known good address, and dig into databases of Illinois motorists and inmates of the county jail and state penitentiary. The investigation went cold, however, because none of these efforts led to Shaikh or generated any further leads. This series of events clearly demonstrated Shaikh's wilful refusal to respond and cooperate with Founders.

17

Khan argues Founders' search was deficient because the insurer did not ask Shaikh's son if there were any other relatives or friends who might know Shaikh's whereabouts. This appears to be speculation on Khan's part as to exactly what was discussed, however, the record shows that even after Founders sent follow-up correspondence to the son's address and explained to him why they were trying to locate Shaikh, the son denied having any contact with Shaikh for more than a decade and speculated that he might be behind bars.

Khan also contends Founders should have specifically warned Shaikh that his non-cooperation would result in a judgment entered against him personally. Shaikh, however, was served with the Khan lawsuit which named him as the defendant.

We also conclude that Founders' defense of Khan action was plainly and substantially prejudiced by the absence of the only known witness to the collision besides Khan. Shaikh's knowledge of the speed of the two vehicles, the force of impact, and Khan's appearance and any complaints of injury after the collision were essential to fairly evaluating the extent of Khan's injuries, particularly where Khan had made numerous claims to insurers before and after his collision with Shaikh.

Our *de novo* review of the record discloses no genuine issue of material fact regarding Shaikh's breach of the assistance and cooperation clause of his insurance contract with Founders and indicates Founders was entitled to judgment as a matter of law on those grounds. For these reasons, we affirm the summary judgment ruling.

Affirmed.

CAHILL and R. GORDON, JJ., concur.